## AMBROSE S. BROWN

### vs.

## CLARENCE E. STUBBS, INSPECTOR OF BUILDINGS.

*Baltimore City: police power; places of amusement; permits; assent of the Mayor and City Council.  Ordinances: title of—; sufficiency.*

The title of Ordinance No. 269 of the Ordinances of the Mayor and City Council of Baltimore City, passed May 20th, 1913, making it necessary that the assent of the Mayor and City Council should be obtained before the Building Inspector could grant an application for a permit to erect, etc., any building, tent, etc., for exhibiting any moving picture shows, is explicit and fulfills all constitutional requirements.

pp. 132, 139

The City of Baltimore, by its charter, besides its power to license, tax and regulate all trades, business, etc., and for licensing, regulating and restraining public amusements, has, under the welfare clause, sub-section 31 of section 6, full power to pass all ordinances, not inconsistent with (the Charter) or the laws of the State, as may be proper in executing any of the powers, express or implied, as well as such ordinances as it may deem expedient to maintain the peace, good government, health and welfare of the city.                     p. 133

The requiring the assent of the Mayor and City Council to the licensing of buildings for moving picture shows is a proper exercise of the police power, and the said ordinance, and is a reasonable exercise of constitutional power.                     p. 134

*Decided February 10th, 1916.*

Appeal from the Superior Court of Baltimore City. (DOBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Burke, Pattison, Urner, Stockbridge and Constable, JJ.

*J. Leiper Winslow,* for the appellant.

*E. J. Colgan, Jr., Assistant City Solicitor,* (with whom was *S. S. Field, City Solicitor,* on the brief), for the appellee.

Boyd, C. J., delivered the opinion of the Court.

This is an appeal from an order overruling a demurrer to an answer to a petition for a mandamus and entering a judgment for the defendant for costs. The petition alleges that the appellant is the owner of the properties known as Nos. 842 and 844 West North avenue, Baltimore City, and that he applied to the appellee, Inspector of Buildings for Baltimore City, for a permit to erect a moving picture theatre upon said properties, in accordance with section 3 of paragraph 1 of an ordinance of the Mayor and City Council of Baltimore, approved June 19, 1908, and known as No. 155, etc. That section is as follows: "The Inspector of Buildings shall receive applications, examine plans, and grant permits for the erection, construction, alteration, repairs and removal of buildings." The Inspector of Buildings refused to issue a permit until the petitioner secured the assent of the Mayor and City Council of Baltimore as required by Ordinance No. 269, passed May 20th, 1913. That ordinance provides that: "No permit shall be issued for the construction of any new building or for the conversion of any existing building, or for the construction or conversion of any tent or other enclosure of any kind whatsoever, or for the erection or operation of any appliance or paraphernalia, whether enclosed or on open lot, to be used for the exhibiting of moving picture shows, until the said application for permit is first assented to by the Mayor and City Council of Baltimore, by ordinance, nor shall such

ordinance be passed until public notice is first given in two daily newspapers of Baltimore City at least once a week for fifteen days prior to the introducing of said ordinance, which notice shall set forth the intention of introducing said ordinance, and which notice shall contain a sufficient description of the provisions of said ordinance for everybody interested to understand the scope and purpose of such measure. The cost of the advertisement of said notice to be borne by the applicant for said permit."

The petition alleges that Ordinance No. 269 was illegal, invalid and of no force or effect in law, in that: "1. The Mayor and City Council had no power or authority to pass said ordinance, and it is, therefore, *ultra vires* and void. 2. That at the time of the passage of same there was no statute of the General Assembly of Maryland in force authorizing the passage of said ordinance, and it has never since been ratified by an Act of the General Assembly of Maryland. 3. Even if there was such a statute, it would have been void and illegal in that it would be unconstitutional as depriving a citizen of Baltimore of his property without due process of law. 4. Said ordinance is discriminatory, oppressive and unequal in its application, and therefore unconstitutional. 5. Said ordinance is invalid and unreasonable, in that it commits to the Mayor and City Council unlimited discretion in granting or refusing said permits, and does not undertake to provide any general rules or regulations limiting the exercise of said discretion."

Before discussing those questions it may be well to refer to several other matters mentioned in the appellant's brief. It is said that from the pleadings it can not be logically deduced that the appellant intends to erect a building, which must necessarily be used for moving picture exhibitions. Inasmuch as the petition alleges that the appellant applied "for a permit to erect a moving picture theatre upon said property," and the refusal to grant that permit is the foundation for the proceeding, we must assume for the purposes of the case, that such was his intention. It is also contended

that the ordinance is invalid because the title is defective and in violation of the provision of the City Charter, that "Every ordinance enacted by the city shall embrace but one subject, which shall be described in its title," etc. (Sec. 221 of the Charter, which is Ch. 123 of the Acts of 1898.) It is said that "the title gives no inkling to a lot owner that he can not erect a tent or install the machine on a vacant lot, without such assent as required in the body of the ordinance." It is sufficient to say that the appellant's application was not for a permit to erect a tent or install the machine on a vacant lot, and hence they are in no way involved in this case. The title is as explicit as could be desired or required in reference to the construction of new buildings, or the conversion of existing buildings, which are to be used for the exhibition of moving picture shows, and hence no one could be misled by the prior reference to the section proposed to be repealed and re-ordained, as suggested by the appellant.

First. The first and second reasons assigned in the petition for the alleged invalidity of the ordinance can be considered together. Assuming that a valid statute could be passed containing such provisions as the ordinance does (which we will consider later), there can be no doubt about the power of the Mayor and City Council to pass the order. Section 6, sub-section (18) of the charter gave it full power and authority: "To pass ordinances for preserving order, and securing property and persons from violence, danger and destruction, protecting the public and city property, rights and privileges from waste or encroachment, and for promoting the great interest and insuring the good government of the City. To have and exercise within the limits of the city of Baltimore all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits," etc. By subsection (14) of section 6 it has the power: "To license, tax and regulate all businesses, trades, avocations, or professions," and by sub-section 29, "To provide for licensing, regulating and restraining theatrical or other public amuse-

ments within the City of Baltimore." Then sub-section 31 of section 6 provides: "The foregoing or other enumeration of powers in this article shall not be held to limit the power of the Mayor and City Council of Baltimore, in addition thereto to pass all ordinances not inconsistent with the provisions of this article or the laws of the State as may be proper, in executing any of the powers, either express or implied, enumerated in this section and elsewhere in this article, as well as such ordinances as it may deem expedient in maintaining the peace, good government, health and welfare of the City of Baltimore," etc.

In *Rossburg v. State*, 111 Md. 394, JUDGE PEARCE, in speaking for the Court, said: "Broader or more comprehensive police powers could not be conferred under any general grant of police power, for the purposes mentioned in section 18, than those granted in that section, and when we consider the 'Welfare Clause' of the charter, section 31, greater emphasis could not be laid upon the implied powers of the city for the maintenance of the peace, good government, health and welfare of the city, than is there laid." Again he said: "The powers thus vested in the city are broad and sweeping, and are expressed in terms which indicate a liberal view of the need of broad powers for effective local government of a great city." As these provisions are so clear and broad, we deem it unnecessary to further discuss this branch of the case. There would seem to be no doubt that if the Legislature can lawfully adopt such regulations as are contained in the ordinance, the Mayor and City Council can do so under the powers conferred on it.

Second. We will therefore determine whether it was within the power of the Legislature to grant such powers. The Legislature by Chapter 693 of the Acts of 1910 (p. 603), created a "Board of Examining Moving Picture Machine Operators," and required such operators to take out a license and submit to an examination. In the Preamble the danger to life and property from explosions caused by the carelessness and incompetency of moving picture machine opera-

tors, was referred to. This Court sustained that Act in *State* v. *Loden,* 117 Md. 373. JUDGE PATTISON, in delivering the opinion of the Court, said: "The danger to life and property incident to the use of moving picture machines, when operated by incompetent persons, is known to all. The films used in connection with the machine are highly explosive and dangerous in their character, and if not properly managed and cared for are liable to explode.

In large cities, compactly built, like Baltimore, there exist possibilities of immense loss of property by fire as was shown by the great fire of 1904, which swept the business section of the city and destroyed property worth many millions of dollars. Moreover, in large cities moving picture machines are usually operated in large, crowded rooms or halls filled with a constantly changing assemblage, largely composed of women and children, and where in the event of explosion or fire, excitement and panic usually follow, resulting in great loss of life. Therefore every reasonable and proper precaution and safeguard should be taken to prevent or lessen the possibilities of fires so destructive and disastrous in their consequences."

It is thus seen that the Legislature and this Court recognized the danger to life and property incident to the use of moving picture machines if improperly operated. It is said in a note to *State* v. *Loden,* as reported in 30 *Am. & Eng. An. Cas.* (1913 Ed.) 1300, that: "In all jurisdictions wherein the question has been passed on it has been held that the public exhibition of moving pictures is a proper subject of regulation under the police power of the State." A number of cases are cited in that note, among others *Dreyfus* v. *Montgomery,* 4 Ala. App. 270, 58 So. 730, in which it is held that the provisions of the Code of that State cited in the note empowering cities to license, regulate, restrain or prohibit places of amusement, gave authority to a city to adopt an ordinance making it unlawful to operate a moving picture show in a certain part of the city. In another case there cited, *Laurelle* v. *Bush,* 17 Cal. App. 409, 119 Pac.

953, it was held: "That the manifest menace of fire and panic likely to result to school children and church congregations from the close proximity of kinetoscope exhibitions is a valid and commendable reason for the proviso found in the amended ordinance prohibiting such exhibitions within 200 feet of a church or school," etc.

Although it may now be very generally conceded that moving picture exhibitions may not only be an innocent but often an instructive amusement, yet it is likewise true that some of them are demoralizing and harmful, particularly to children, as well as dangerous to the patrons, and to property, if not properly conducted. In *Higgins* v. *Lacroix,* 119 Minn. 145; 137 N. W. 417; 41 L. R. A. (N. S.) 737, the Court said: "To say the least, opinions are quite at variance as to the merits of moving picture shows as an influence for good or evil in a community. It must therefore be classed among those pursuits which are liable to degenerate and menace the good order and morals of the people, and may therefore not only be licensed and regulated, but also prevented by a village council." They often attract great crowds, including women and children, and hence the danger from fire or a stampede as the result of an alarm of fire, should be as carefully guarded against as possible. Indeed when we recall some of the great disasters which have occurred in theaters in this country, it may well be questioned whether there has been as much supervision over the location and construction of the buildings used for places of amusement, even before the time of moving pictures, as there should have been, and as greater danger from fire from the exhibition of moving pictures seems to exist than from most other entertainments held in theatres and public halls, it is not only the right, but the duty of the municipal authorities of our cities and towns to increase their efforts to make them safe, in proportion to the increased danger from them. At some locations they may be safer than at others, and there is less danger to adjoining properties in some parts of the city than in others. It would be very difficult, if not

impossible, to draw a general ordinance which would accomplish all that is proper, without doing injustice to some. and we can see no reason why an applicant for a license should not be required to first get a permit from the Mayor and City Council. It is said that that may result in one person being permitted to build, while another under similar circumstances may not, but there ought not to be more danger of that from the Mayor and City Council than from a board or some official. It may be more difficult and expensive to obtain a permit, but that does not necessarily invalidate an ordinance.

Although the appellant contends that the case of *Commissioners of Easton* v. *Covey,* 74 Md. 262, is widely different from this, it seems to us to be conclusive as to some of the questions involved. The inhabitants of Easton were incorporated by the name of "The Commissioners of Easton." Among the powers granted was that of making such "ordinances as they may deem necessary and beneficial to said town." Under that power they passed an ordinance "to regulate the erecting of new buildings within the limits of Easton." The ordinance provided that "it shall not be lawful for any person or persons to erect or build any dwelling house, barn, shed, stable, store-house, warehouse or shop, within the limits of this town, or any porch on any part of the sidewalks, without first obtaining a permit from the Commissioners of the town through their clerk, to erect the same, for which the sum of one dollar shall be paid for each and every permit *so granted,* the same to be applied to the general expenses of the town," and then prescribed a penalty for its violation. This Court, speaking through Judge Miller, after saying there was nothing in the subsequent special grants of power mentioned, manifesting an intent thereby to limit the legitimate operation of the general clause, said: "We also think it equally clear, that an ordinance passed under this clause to *regulate* the erecting of *new buildings* within the corporate limits, by providing that no such building shall be erected without a *permit* therefor,

first obtained from the Commissioners, is not only *reasonable*, but useful, if not essential to the welfare and prosperity of the town. Like ordinances have been passed by the corporate authorities of other towns and cities under just such general grants of power as this, and we have found no case in which their validity has been denied." Again it was said: "The main purpose of the ordinance is to give the Commissioners power to *control* the erection of *new buildings*, so that whenever such building, either by the character of the materials out of which, or the manner in which, it is proposed to be built, its location in the town, or the character of the business proposed to be carried on therein, would in their judgment be *detrimental* to the town, they may prevent its erection by refusing a permit. In each case the granting or refusal of a permit is confided to their *discretion*." The Court concluded by saying: "We are therefore of opinion the Legislature has granted the power to pass this ordinance; that it is not unreasonable; that under it the Commissioners have a *discretion* to grant or refuse a permit in each case of an application therefor, and have also the power to enforce the ordinance. For these reasons the order granting the mandamus must be reversed. In so deciding we do not, in our judgment, interfere with the well settled rule that it is the plain duty of the Courts to see that corporate authorities do not transgress the authority delegated to them."

It will be remembered that JUDGE MILLER also delivered the opinion in *Mayor, &c., of Baltimore* v. *Radecke*, 49 Md. 217, where the Court held, that an ordinance giving the Mayor power to revoke permits for steam engines and boilers was invalid, but that opinion went on to say, "We are not to be understood as expressing any disapproval of the section of the Ordinance of 1858, which requires a permit from the Mayor and City Council for the erection of all such engines within the city limits," and in *Commissioners of Easton* v. *Covey, supra*, JUDGE MILLER called special attention to that part of the opinion in *Radecke's case*.

The case of *Commissioners of Easton* v. *Covey* has not been overruled or disturbed by any subsequent decision of this Court. On the contrary, in those cases most relied on by the appellant the Court expressly stated they were not in conflict with that case. Take for example, *Hagerstown* v. *B. & O. R. R. Co.*, 107 Md. 178, which more nearly resembles *Radecke's case*. It came before this Court on an appeal from an order overruling a demurrer to a bill in equity filed by the Railroad Company to prevent the enforcement of an ordinance. The Railroad Company was engaged in a lawful business, and was compelled, as a common carrier, to carry such live stock as was mentioned in the ordinance. It had erected on its own land, convenient to its station and place of starting in Hagerstown, proper accommodations to receive live stock offered for transportation, being an enclosure into which it was driven. The company alleged in the bill that it was impossible to locate the stockyards at a convenient place near to the station and the place of starting, as required by its charter, without having it within the prohibited distance from two or more residences situated within the corporate limits of Hagerstown and upon a public street thereof, and that it was impracticable to keep and maintain the stockyards for the uses stated in compliance with the requirements of the ordinance, which facts were admitted by the demurrer. The Court said: "A stock yard situated in a town is not a nuisance *per se*, yet this ordinance makes unlawful that which it is necessary for the plaintiff to do in the performance of its duties, as a common carrier, and which confessedly under the demurrer is not a nuisance." While the City of Hagerstown had considerable power conferred on it, there was no such provision in its charter as that in the Charter of Baltimore in reference to the Police Power: "To have and exercise within the limits of the City of Baltimore all the power commonly known as the Police Power, to the same extent as the State has or could exercise said power within said limits." The ordinance was unreasonable and in no

way necessary for the proper protection of the citizens of Hagerstown, and was of a character which might readily be used in discriminating in favor of or against one of the railroad companies already there.

The case of *Fischer* v. *St. Louis*, 194 U. S. 361, is one of those that were expressly referred to by JUDGE BRISCOE as unlike the Hagerstown case. That case decided, quoting from the syllabus for convenience, that "Neither due process of law nor the equal protection of the laws is denied by a municipal ordinance adopted under legislative authority forbidding the establishment or maintenance of a dairy or cow stable within the city limits without having received permission so to do from the municipal assembly, by a proper ordinance." The Court considered the argument that there was danger of discrimination and pointed out how it might be proper to grant a permit to one applicant and to refuse another. Although we will not quote further from it it furnishes conclusive answers to several of the points urged by the appellant as to discrimination, inequality, &c., liable to result.

In *Bostock* v. *Sams*, 95 Md. 400, the case of *Commissioners of Easton* v. *Covey, supra*, was again referred to, and it was said of it: "There the ordinance looked to guarding the public safety and was held to come within the police power which had been conferred upon the corporation enacting the ordinance; and to be in consonance with the general powers and purposes of the corporation." But it will serve no good purpose to prolong this opinion by discussing or referring to other cases. From what we have said it will be seen that in our judgment the Mayor and City Council had the power to pass the ordinance and that it is not unreasonable or invalid by reason of any of the objections urged against it. The order appealed from will therefore be affirmed.

*Order affirmed, the appellant to pay the costs.*